IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     vs.<br><br>PHILIP D. AUSHERMAN,<br><br>          Defendant. | **8:24-CR-195**<br><br><br>**MEMORANDUM AND ORDER ON THE DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL AND, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL** |

Defendant Philip D. Ausherman was charged with conspiracy to possess with intent to distribute 50 grams or more of methamphetamine (actual) (Count I) and possession with intent to distribute a detectable amount of a mixture or substance containing a detectable amount of methamphetamine (Count VII). Filing 41. Following a four-day trial, a jury found Ausherman guilty of Count I and not guilty of Count VII. Filing 278. Ausherman subsequently filed a Renewed Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure 29(c) and, In the Alternative, Motion for New Trial Under Federal Rule of Criminal Procedure 33. Filing 293. Ausherman contends that the jury's verdict on Count I "should be set aside because the evidence was insufficient to prove beyond a reasonable doubt that Mr. Ausherman knowingly and intentionally joined an agreement to possess methamphetamine actual with intent to distribute it." Filing 293 at 1. Ausherman argues that even if the Court finds the evidence was sufficient to support a guilty verdict on Count I, the Court should alternatively set aside the verdict because it "is against the weight of

1

the evidence and the interest of justice requires a new trial." Filing 293 at 1. For the reasons set forth below, Ausherman's motion is denied.

## I. BACKGROUND

On February 18, 2025, the grand jury returned a seven-count Superseding Indictment against six defendants, including Philip D. Ausherman. Filing 41. Ausherman was named in Counts I and VII. Filing 41 at 1, 3–4. Count I charged that from as early as June 1, 2023, to on or about January 29, 2025, Ausherman and his five codefendants conspired to possess with intent to distribute 50 grams or more of methamphetamine (actual) in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(A), and 21 U.S.C. § 846. Filing 41 at 1. Count VII charged that on or about January 29, 2025, Ausherman possessed with intent to distribute a detectable amount of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C). Filing 41 at 3–4. Ausherman proceeded to trial on both counts on April 20, 2026. Filing 211 (Final Trial Order).

The evidence at the four-day trial showed that on January 29, 2025, Deputy Anthony Crawford of the Douglas County Sheriff's Office arrested Ausherman for committing a traffic violation. Deputy Crawford first noticed Ausherman's vehicle parked outside of and facing away from a gated storage facility shortly before the facility was going to close for the night. Deputy Crawford was familiar with the storage facility and knew from his law enforcement experience that criminal activity frequently occurred at that facility. After Deputy Crawford drove his marked police cruiser through the storage facility's gate, Ausherman drove away. Deputy Crawford exited the facility, began following Ausherman's vehicle, and ultimately observed Ausherman commit a traffic violation (failure to signal 100 feet before changing lanes). Deputy Crawford conducted a traffic stop of Ausherman's vehicle, at which point he learned Ausherman's identity and ran Ausherman's

2

name over his cruiser's radio. Deputy Daniel Eads, another officer with the Douglas County Sheriff's Office, called Deputy Crawford after hearing Ausherman's name on the radio and informed Deputy Crawford that he would be coming to the traffic stop. Deputy Eads was part of a Federal Bureau of Investigations (FBI) task force that primarily conducted cartel investigations and prior to the January 29 traffic stop, Deputy Eads had observed Ausherman to be part of an ongoing task force investigation. Deputy Crawford requested the assistance of a drug K-9 and, before the K-9 arrived, issued Ausherman a written warning for failing to signal and removed Ausherman from his vehicle. Deputy Crawford conducted a pat down of Ausherman and had Ausherman sit in the backseat of the police cruiser. After both Deputy Eads and the K-9 were on the scene, the K-9 officer led the K-9 around Ausherman's vehicle. The K-9 indicated to the odor of narcotics, and the officers searched the vehicle as well as Ausherman's person.

Deputy Crawford discovered $574 in cash in Ausherman's pocket, and the search of Ausherman's vehicle revealed an additional $465 in cash in a wallet. The search of Ausherman's vehicle also resulted in the discovery of a Pringles can with a false bottom that contained a dark colored cloth, a pipe with suspected methamphetamine residue, and two bags of suspected methamphetamine, each containing a different amount. One of the bags was found with the pipe wrapped inside the cloth while the second bag was separate from the other materials. The larger amount of suspected methamphetamine was later weighed and tested by a laboratory and was revealed to be 7.391 grams of methamphetamine (actual) with a purity of 94.2%. At some point while Ausherman was in the police cruiser, Deputy Eads introduced himself to Ausherman and explained that he primarily investigated cartel-related crimes. Deputy Eads testified that Ausherman responded by stating that Deputy Eads already knew who Ausherman was and that Ausherman could "get" law enforcement Sinaloa (referring to the Sinaloa cartel). After Ausherman agreed to

participate in an interview, Deputy Crawford transported him to the Douglas County Sheriff's Office, where Deputy Eads conducted an unrecorded interview of Ausherman while Deputy Crawford was present.

Both Deputy Crawford and Deputy Eads testified about the content of Ausherman's interview, and the Court will discuss specific details below as they are relevant to its analysis. For background purposes, however, the Court summarizes the deputies' testimony as follows. During the interview, Ausherman informed Deputy Eads that Ausherman and his girlfriend, Tiffany Bucci, would contact a man in Mexico named "Mike" to receive methamphetamine.  Mike would then send a "runner" or drug courier to meet with Ausherman and Bucci in Omaha, Nebraska, and they would purchase methamphetamine from the runner. Ausherman told the officers that he and Bucci had purchased one-half pound to one-pound quantities of methamphetamine three times a week for the six months preceding the interview. Ausherman also told Deputy Eads that Ausherman paid $2,500 per pound of methamphetamine, and Ausherman shared the addresses of at least four different locations where he would meet Mike's runners. When Deputy Eads showed him multiple pictures of individuals, Ausherman identified three as being runners (although he did not state the individuals' names). Ausherman showed Deputy Eads WhatsApp messages on Ausherman's phone between Ausherman and a man named "Mike." Deputy Eads took a video of Mike's contact information—which included a Mexican phone number and a contact picture of the captured leader of the Sinaloa drug cartel—and of the messages between Ausherman and Mike—which included discussions of "pizzas" and Ausherman's "bandmates." During the interview, Deputy Eads asked Ausherman where Ausherman kept his scale, and Ausherman responded that he kept his scale in the basement of Bucci's house.

4

Among other things, the Government offered into evidence the WhatsApp messages between Ausherman and Mike and a digital drug scale, an orange pipe, and a plastic bag containing other narcotics packaging that were all discovered in the basement of Bucci's house during the execution of a search warrant on January 30, 2025. The Government also called Carlos Sandoval-Portillo—a man depicted in one of the pictures Deputy Eads showed Ausherman during the interview and who Ausherman said he recognized as a drug courier—as a witness, and Sandoval-Portillo testified pursuant to a cooperation agreement with the Government that although he did not recall ever distributing methamphetamine to Ausherman, he did encounter Ausherman while Ausherman was in pretrial detention. Sandoval-Portillo testified that Ausherman bragged to Sandoval-Portillo that the officers who arrested Ausherman did not find enough evidence to convict him.

Ausherman's theory of defense was that he was a methamphetamine user, not a distributor. Ausherman admitted that he had placed the methamphetamine in the Pringles can discovered in his vehicle on January 29, 2025, and he testified that he volunteered to cooperate with law enforcement that night because he was just a simple user. Ausherman contested nearly every aspect of Deputy Eads's and Deputy Crawford's depiction of the interview, from stating that he did not identify any runners during the interview to explaining that he never told the deputies that he *and* Bucci were receiving one-half pound to one-pound quantities of methamphetamine three times a week to testifying that his WhatsApp responses to Mike were designed to get Mike to leave him alone. Ausherman also testified that he never spoke to Sandoval-Portillo in pretrial detention, never received methamphetamine from Mike, and never sent money to Mike via Cash App.

Ultimately, the jury did not believe Ausherman and found him guilty of Count I. Filing 278. The jury returned a not guilty verdict as to Count VII. Filing 278. Ausherman then timely filed the

pending Renewed Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure 29(c) and, In the Alternative, Motion for New Trial Under Federal Rule of Criminal Procedure 33. Filing 293.

## II. LEGAL ANALYSIS

There are two parts to Ausherman's motion: a Rule 29 component and a Rule 33 component. Both components of the motion address the jury's guilty verdict on Count I, but they are governed by different standards and require different analyses. As a result, the Court will examine each part in turn, beginning with Ausherman's Renewed Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure 29(c).

### A. Motion for Judgment of Acquittal

#### 1. Rule 29 Standards

Rule 29(c) of the Federal Rules of Criminal Procedure provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." A trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Although Rule 29(c) "permits defendants to move the court to set aside a verdict and enter judgment of acquittal after trial," a "district court has very limited latitude to do so," *United States v. Hassan*, 844 F.3d 723, 725 (8th Cir. 2016), and the court should "not lightly overturn a jury's verdict," *United States v. Cannon*, 160 F.4th 911, 917 (8th Cir. 2025) (internal quotation marks and citation omitted). *See also* Fed. R. Crim. P. 29(c)(2) ("If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."). In determining whether the evidence is sufficient to sustain a conviction, the Court "must not assess credibility or weigh evidence, and the evidence must be viewed in a light most favorable to the government." *Hassan*, 844 F.3d at 725.

Because "assessing witness credibility 'is uniquely within the province of the trier of fact,'" the Court should "not second guess the jury's credibility determinations" in ruling on a motion for judgment of acquittal. *Cannon*, 160 F.4th at 917 (quoting *United States v. Nelson*, 51 F.4th 813, 817 (8th Cir. 2022)). A judgment of acquittal is appropriate "only when no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Plume*, 110 F.4th 1130, 1133 (8th Cir. 2024) (quoting *United States v. McDonald*, 826 F.3d 1066, 1072 (8th Cir. 2016)).

Ausherman previously moved for a judgment of acquittal at the close of the Government's case in chief and at the close of all evidence. On both occasions, the Court denied Ausherman's motion on the grounds that there was sufficient evidence for a reasonable jury to conclude that Ausherman was guilty of both Count I and Count VII. Now that the jury has returned a guilty verdict on Count I, Ausherman asks the Court to "set aside the verdict and enter an acquittal" on that count because, he asserts, the Government's evidence at trial did not "establish actual agreement" as required to prove conspiracy. Filing 293 at 1; Filing 294 at 4. The Court will not disturb its prior rulings on Ausherman's motion for a judgment of acquittal and will therefore deny his Renewed Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure 29(c).

2. *The Parties' Arguments*

As the Court instructed the jury at trial, the Government had to prove three elements beyond a reasonable doubt to convict Ausherman of Count I: (1) two or more persons reached an agreement or came to an understanding to possess with intent to distribute methamphetamine (actual); (2) Ausherman voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and (3) at the time Ausherman joined in the agreement or understanding, he knew the purpose of the agreement or understanding. Filing 287 at 19; *see also United States v. Magallon*, 984 F.3d 1263, 1288 (8th Cir. 2021) ("A

7

controlled-substance conspiracy charge requires proof of three elements: (1) that an agreement to distribute drugs existed; (2) that the defendant knew of the agreement; and (3) that the defendant knowingly joined and participated in the conspiracy."). Ausherman takes issue with the Government's proof of the second and third elements when he argues that instead of proving "a knowing, voluntary, and intentional agreement by Mr. Ausherman to possess methamphetamine actual with intent to distribute it," the Government "at most" proved "suspicion of drug involvement, association with problematic actors, contested communications, and alleged admissions not preserved in a trustworthy manner." Filing 293 at 2; Filing 294 at 5. According to Ausherman, the Government failed to "bridge [the] gap" between "presence, knowledge, or even a buyer-seller relationship" and "conspiracy," and he contends that his "unrecorded custodial statement" and the testimony of Carlos Sandoval-Portillo are not strong enough to "sustain a conviction" on Count I. Filing 294 at 5–6. Ausherman also suggests that his acquittal on Count VII—while alone not enough to "compel acquittal on Count I"—"sharpens the insufficiency argument" and "underscores the failure of proof" because "it is powerful confirmation that the government failed to prove the distributive intent that lay at the center of both counts." Filing 293 at 2; Filing 294 at 6.

   *3.   Applicable Standards*

   The Eighth Circuit Court of Appeals has frequently addressed what evidence is and is not sufficient to support a conspiracy conviction, and Ausherman is correct that proving membership in a conspiracy requires more than proving mere presence, knowledge, or a buyer-seller relationship. *See, e.g.*, *United States v. Conway*, 754 F.3d 580, 587 (8th Cir. 2014) ("[A] defendant's mere presence, coupled with the knowledge that someone else who is present intends to sell drugs, is insufficient to establish membership in a conspiracy." (internal quotation marks and citation omitted)); *United States v. Price*, 542 F.3d 617, 620 (8th Cir. 2008) ("Mere knowledge of a criminal

8

conspiracy is insufficient."); *United States v. Rodriguez*, 984 F.3d 704, 708–9 (8th Cir. 2021) ("distinguish[ing] between a conspiracy and a mere buyer-seller relationship" and explaining that "[e]vidence of a single transaction . . . involving small quantities of drugs consistent with personal use is consistent with a mere buyer-seller relationship" (internal quotation marks and citations omitted)). But the Eighth Circuit has also held that "[a] defendant may be convicted for even a minor role in a conspiracy," *United States v. Magallon*, 984 F.3d 1263, 1288 (8th Cir. 2021) (internal quotation marks and citation omitted), and that "[t]o prove the existence of a conspiracy, the government need not establish the identities of the other coconspirator(s)" or the existence of "[a]n express agreement," *Rodriguez*, 984 F.3d at 708 (internal quotation marks and citations omitted). "The government may prove a defendant's involvement in a conspiracy with direct or circumstantial evidence," *Conway*, 754 F.3d at 587, and indeed "[e]vidence of a conspiracy will often be circumstantial due to a conspiracy's necessary aspect of secrecy," *Cannon*, 160 F.4th at 918 (internal quotation marks and citation omitted). "[A] defendant need not be caught 'red-handed' with drugs to be convicted" of conspiracy, and evidence demonstrating that the defendant "associated with other members of the conspiracy" can "support[ ] an inference of his participation." *Conway*, 754 F.3d at 588.

### 4. *Ausherman is Not Entitled to a Judgment of Acquittal on Count I*

There is no question that Ausherman was not "caught 'red-handed'" with 50 grams or more of methamphetamine (actual) in this case. *Conway*, 754 F.3d at 588. The Court nonetheless determines that there is sufficient evidence for a reasonable jury to conclude that Ausherman voluntarily and intentionally joined an agreement to possess with intent to distribute 50 grams or more of methamphetamine (actual) and that he knew the purpose of the agreement when he joined. First and most significantly, there is evidence that Ausherman admitted as much during his interview

with Deputy Eads and Deputy Crawford. Between their testimonies, the deputies testified that Ausherman admitted who he was involved with (Bucci and "Mike," a Mexican source of supply); what he did (contact Mike so that he and Bucci could purchase methamphetamine from Mike's runners, three of whom Ausherman recognized); how much methamphetamine he and Bucci purchased (one-half pound to one-pound quantities); when they purchased the methamphetamine (three times a week for six months); where they purchased the methamphetamine (at least four different addresses); and how much they paid for the methamphetamine ($2,500 per pound). Furthermore, Deputy Eads testified that these admissions were consistent with information law enforcement already knew.

For instance, Deputy Eads testified that the task force had been investigating a Mexican contact known by multiple names, including "Mike Guzman" and "Mike Jones," who was working on behalf of the Sinaloa cartel as source of supply of methamphetamine. Multiple law enforcement witnesses explained that customers in Omaha would reach out to the Mexican source of supply, and the source of supply would arrange for drug couriers to meet with the customer in Omaha. The customer would either pay the courier in full for the drugs he delivered, or the customer would send some of the payment directly to the source of supply using online payment methods like Cash App. Deputy Eads testified that prior to the interview on January 29, the task force had subpoenaed the source of supply's Cash App account and had identified Ausherman's Cash App account as an account that had sent money to the source of supply on more than one occasion. Deputy Eads also testified that: (1) either he or other members of the task force had already conducted controlled buys at all but one of the locations Ausherman provided during the interview; (2) the three individuals that Ausherman identified as runners were already known to Deputy Eads; (3) the Mexican phone number associated with "Mike," who Ausherman had been messaging on WhatsApp, was already

known to Deputy Eads and Deputy Eads had previously used that phone number to conduct controlled buys; (4) the word "pizzas" used by Mike and Ausherman in the WhatsApp messages is a code word for one pound of methamphetamine; and (5) at the time of Ausherman's arrest, one pound of methamphetamine sold for approximately $2,500 to $2,700.

A reasonable jury could infer that by admitting specific details of his involvement with Mike—details that were consistent with law enforcement's investigation—Ausherman "knew about the conspiracy and knowingly acted in furtherance thereof." *United States v. Almeida-Olivas*, 865 F.3d 1060, 1063 (8th Cir. 2017). This is true even though Ausherman testified to the contrary because Ausherman's "credibility was for the jury to weigh" and "[i]t was not bound to accept the verity of his account." *United States v. Madrigal*, 136 F.4th 766, 773 (8th Cir. 2025). Apart from the deputies' testimony of Ausherman's interview, the trial evidence also included Deputy Eads's testimony that Ausherman had come up in his investigation before the January 29 traffic stop; the cash, drugs, and drug paraphernalia discovered during the traffic stop; Ausherman's WhatsApp messages with Mike; a drug scale and drug packaging material discovered in Bucci's basement; Sergeant William Koepke's expert testimony that packaging materials, scales, and United States currency are hallmarks of distribution; and Sandoval-Portillo's testimony that Ausherman bragged that there was not enough evidence to convict him.

This specific evidence—along with the other evidence presented at trial, including evidence that Ausherman's admissions were consistent with facts already known to law enforcement—also forecloses Ausherman's claim that the "trial record here shows the opposite of substantial corroboration." Filing 294 at 6. Although the Eighth Circuit's "jurisprudence" dictates that "an accused may not be convicted on his own uncorroborated confession," *United States v. Eagle*, 515 F.3d 794, 807 (8th Cir. 2008), "corroborating evidence need not be sufficient, on its own, to establish

11

the body of the offense beyond a reasonable doubt, or even by a preponderance of the evidence," so long as the evidence "fortifies the truth of the confession" and "support[s] a jury's inference of [its] truth," *United States v. Kirk*, 528 F.3d 1102, 1111 (8th Cir. 2008) (internal quotation marks omitted) (quoting *Wong Sun v. United States*, 371 U.S. 471, 489 (1963)). The Government provided such corroborating evidence here. For instance, Ausherman's WhatsApp messages discussing "pizzas" with Mike and law enforcement testimony explaining the coded meaning of that word "support . . . the essential facts" of Ausherman's voluntarily and intentional joinder in the drug trafficking conspiracy and his knowledge of the conspiracy's aim, as does Deputy Eads's testimony that even before his arrest Ausherman told the deputy that Ausherman could help him "get" the Sinaloa cartel. *Kirk*, 528 F.3d at 1111. Similarly, the discovery of a drug scale and narcotics packaging in Bucci's basement "fortifies the truth" of Ausherman's interview statement that he kept his scale in his girlfriend's basement. *Id.* (internal quotation marks and citation omitted). Although this and other evidence referenced in the Court's order may not "prove the offense" on its own, it does sufficiently corroborate Ausherman's interview statements such that a reasonable jury could conclude the Government met its burden to prove each element of Count I. *Eagle*, 515 F.3d at 807.

The fact that the jury returned a not guilty verdict on Count VII does not change the Court's conclusion. Ausherman argues that "[t]he jury's acquittal on Count VII underscores the failure of proof" as to Count I because the split-verdict is "powerful confirmation that the government failed to prove the distributive intent that lay at the center of both counts." Filing 293 at 2. In making this argument, Ausherman overlooks a key reality: "different elements are required to prove" a conspiracy to possess with intent to distribute methamphetamine (Count I) and possession with intent to distribute methamphetamine (Count VII). *United States v. Trejo*, 831 F.3d 1090, 1094 (8th Cir. 2016). As Ausherman repeatedly points out in his brief, a conspiracy charge turns on the

12

existence of an agreement and a defendant's knowing and voluntary participation in that agreement. *See Magallon*, 984 F.3d at 1288 (elements of conspiracy). To convict a defendant of conspiracy, "[t]he government does not have to prove that the defendant intended to commit the underlying offense himself" or even that he was able to do so, as "a conspirator may be convicted even though he was incapable of committing the substantive offense himself." *Ocasio v. United States*, 578 U.S. 282, 288–89 (2016) (internal quotation marks and citations omitted). The Court has already set forth in detail the evidence supporting the jury's reasonable conclusion that Ausherman knowingly, intentionally, and voluntarily entered an agreement to possess with intent to distribute 50 grams or more of methamphetamine (actual). That the jury did not find Ausherman guilty of actually possessing with intent to distribute any methamphetamine "does not invalidate the conspiracy conviction." *United States v. Ruiz-Estrada*, 312 F.3d 398, 403 (8th Cir. 2002).

Viewing the trial evidence "in the light most favorable to the verdict" and "[a]ccepting the jury's credibility determinations," the Court therefore concludes that there is sufficient evidence for a reasonable jury to find that the Government proved each element of Count I beyond a reasonable doubt. *Cannon*, 160 F.4th at 918. Accordingly, the Court denies Ausherman's Renewed Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure 29(c).

### B. Motion for New Trial

#### 1. Rule 33 Standards

The Court turns to Ausherman's alternative request for a new trial. Filing 293 at 1 ("In the alternative, Mr. Ausherman moves for a new trial under Federal Rule of Criminal Procedure 33."). Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "When making a new trial determination, the district court has much broader discretion and

may weigh the evidence, choose to believe or disbelieve witnesses, and may 'grant a new trial even where there is substantial evidence to sustain the verdict.'" *United States v. Lemoine*, 104 F.4th 679, 685–86 (8th Cir. 2024) (quoting *United States v. Amaya*, 731 F.3d 761, 764 (8th Cir. 2013)). "Despite the broad discretion district courts enjoy under Rule 33(a), there are 'limits,' and the courts 'must exercise the Rule 33 authority sparingly and with caution.'" *United States v. Dowty*, 964 F.3d 703, 708 (8th Cir. 2020) (quoting *Amaya*, 731 F.3d at 764). "A court 'should not grant a motion for a new trial simply because it would have reached a different verdict.'" *Id.* (quoting *United States v. Bertling*, 510 F.3d 804, 808 (8th Cir. 2007)).

### 2. *Ausherman is Not Entitled to a New Trial*

Here, Ausherman argues that "[e]ven if the Court concludes that the evidence clears Rule 29's legal-sufficiency threshold, the verdict [on Count I] should not stand under Rule 33" because "[t]he weight of the evidence cuts against the verdict" and "the conviction is too unreliable to support judgment." Filing 293 at 3. Ausherman cites four reasons he believes a new trial is appropriate in this case: (1) "the qualitative weakness of the Government's evidence is plain"; (2) "the Count VII acquittal is powerful weight-of-the-evidence evidence, even if not dispositive as a matter of law"; (3) "comparison to cases sustaining conspiracy convictions confirms how thin this record is"; and (4) "the Court is not required under Rule 33 to ignore common sense." Filing 294 at 7–8. Ausherman asserts that the verdict on Count I was "built on pressure-laden testimony, unrecorded admissions, weak corroboration, and a substantive acquittal that exposes the weaknesses of the broader distribution theory." Filing 294 at 8. "Allowing Count I to stand on such foundation," Ausherman contends, "would risk a miscarriage of justice." Filing 294 at 8.

"New-trial motions based on the weight of the evidence are generally disfavored," and "[a] district court may grant a new trial for insufficiency of the evidence only if the evidence weighs

14

heavily enough against the verdict that a miscarriage of justice may have occurred." *Dowty*, 964 F.3d at 708 (internal quotation marks and citations omitted). Even exercising its broader Rule 33 authority, the Court cannot conclude that the evidence in this case "preponderate[s] heavily against the verdict" on Count I "such that it would be a miscarriage of justice to let the verdict stand." *Bertling*, 510 F.3d at 808 (internal quotation marks omitted) (quoting *United States v. Campos*, 306 F.3d 577, 581 (8th Cir. 2002)). At the outset, the Court finds that the same evidence cited in the Court's Rule 29 ruling above as being sufficient for a reasonable jury to reach a guilty verdict on Count I is also sufficient to sustain the guilty verdict under Rule 33, even though the Court no longer views the evidence in a light most favorable to the Government. The crux of this case was the content of Ausherman's unrecorded interview with Deputy Eads and Deputy Crawford. Deputy Eads, Deputy Crawford, and Ausherman all testified to varying degrees about the content of Ausherman's interview and the Court was able to observe each witness's demeanor and decide whether to believe or disbelieve him. The Court found the deputies' depiction of the interview to be more credible than Ausherman's. Moreover, as the Court has explained above, the Government presented sufficient "independent evidence that bolster[ed] the accuracy" of Ausherman's admissions and "fortifie[d] the truth" of his statements. *Kirk*, 528 F.3d at 1111 (internal quotation marks and citations omitted). The Court acknowledges that it was certainly inconvenient from an evidentiary standpoint that Ausherman's interview was not recorded but the Court does not believe that this renders the Government's case "qualitative[ly] weak[ ]," as Ausherman argues, and there is no basis to Ausherman's broader argument that testimonial evidence is somehow less weighty than other types of evidence. Filing 294 at 7.

Furthermore, to grant a new trial on Count I because Sandoval-Portillo testified under a cooperation agreement and with the assistance of a Spanish interpreter or because Ausherman was

not arrested with a large amount of methamphetamine or because the jury acquitted him on Count VII would be to give "unduly greater weight" to "irrelevant or improper factor[s]." *Campos*, 306 F.3d at 580. The jury was tasked with deciding whether Sandoval-Portillo's testimony "may have been influenced by his hope of receiving a reduced sentence," and the jury found him to be credible. Filing 287 at 15. The Court concludes that this credibility finding is supported by the trial record and does not constitute a miscarriage of justice. *See United States v. Delacruz*, 865 F.3d 1000, 1006 (8th Cir. 2017) (rejecting the defendant's argument that "a miscarriage of justice may have occurred because the government's case lacked physical evidence and its witnesses were motivated by the potential for leniency, were memory-impaired from past drug use, and provided some inconsistent statements"). Given that "a defendant need not be caught 'red-handed' with drugs to be convicted of" conspiring to possess with intent to distribute drugs, *Conway*, 754 F.3d at 588, the Court also cannot find that a guilty verdict on Count I "may have been a miscarriage of justice" because law enforcement did not locate pound-level quantities of methamphetamine during its investigation of Ausherman, *Dowty*, 964 F.3d at 708. Nor can the Court conclude that the jury's verdict on Count I may have been a miscarriage of justice simply because the jury acquitted Ausherman on Count VII, as apparently inconsistent verdicts "are not, on their own, sufficient grounds for reversal or a new trial." *United States v. Armstrong*, 253 F.3d 335, 336 (8th Cir. 2001) (internal quotation marks and citation omitted). "The only relevant question when reconciling inconsistent verdicts . . . is whether there was enough evidence presented to support the conviction," and the Court finds here that there is enough evidence to support Ausherman's conviction of Count I. *Id.* (alteration in the original) (quoting *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir. 1998)).

Having presided over the four-day trial in this matter, recounted the evidence at length in this order, weighed the evidence, and assessed the credibility of the witnesses, the Court concludes

that the evidence "was not so strongly in favor of acquittal that the jury's verdict[ ]" on Count I "may have been a miscarriage of justice." *Dowty*, 964 F.3d at 708. The Court therefore denies Ausherman's request for a new trial.

### III. CONCLUSION

For the foregoing reasons, Ausherman's renewed motion for a judgment of acquittal and his alternative motion for a new trial are both denied. Whether viewed through the lens of Rule 29 or Rule 33, the trial evidence is sufficient to support a guilty verdict on Count I. Accordingly,

IT IS ORDERED that defendant Philip D. Ausherman's Renewed Motion for Judgment of Acquittal Under Federal Rule of Criminal Procedure 29(c) and, In the Alternative, Motion for New Trial Under Federal Rule of Criminal Procedure 33, Filing 293, is denied.

Dated this 17th day of July, 2026.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge